IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THOMAS COOPER,<br>   Plaintiff, | *<br>*<br>* |
| v. | CIVIL ACTION NO. PJM-10-768 |
| | * |
| D. KENNETH HORNING, et al.,<br>   Defendants. | *<br>* |

\*\*\*\*\*\*

## MEMORANDUM OPINION

Pending is Thomas Cooper's (Cooper) pro se prisoner civil rights complaint, as amended, filed pursuant to 42 U.S.C. § 1983, raising claims of inadequate medical treatment and unconstitutional conditions of confinement. A dispositive motion has been filed on behalf of Defendants D. Kenneth Horning Warden of the Roxbury Correctional Institution (RCI), J. Michael Stouffer,[1] Officer Turner, and Sgt. Burkett ("State Defendants"). ECF No. 19 and 25. Separate dispositive motions were filed for Correctional Medical Services Inc. ("CMS")[2] and Wanda Diaz. ECF No. 12 and 29. Cooper has replied and moves for summary judgment in his favor. ECF No. 17, 21 and 33. After considering the pleadings, exhibits, and applicable law, the Court determines that a hearing is not necessary. *See* Local Rule 105.6 (D. Md. 2010). Summary judgment will be granted in favor of Defendants and against Plaintiff.

## PLAINTIFF'S CLAIMS

---

[1] J. Michael Stouffer is Maryland's Commissioner of Correction. Apart from naming Commissioner Stouffer as a party defendant, Cooper raises no claim against him in either his official or individual capacity. To the extent Cooper raises this claim based on supervisory liability, there is no respondeat superior liability in § 1983 proceedings. *See Monell v. New York Department of Social Services*, 436 U.S. 658, 691 (1978). Accordingly, J. Michael Stouffer will be dismissed as a defendant in this case.

[2] Cooper names "Medical Department, MCTC" as a defendant. Correctional Medical Services, Inc. is a private corporation that has contracted with the State of Maryland to provide medical

Cooper, who is presently incarcerated at the Roxbury Correctional Institution (RCI) claims that he was provided inadequate treatment for an earache at the time he was an inmate at the Maryland Correctional Training Center ("MCTC"). Specifically, he alleges that when he was prostrate in his cell suffering from severe ear pain on September15, 2009, "Nurse Wanda" told Officer Turner that unless Cooper was having a heart attack, he needed to fill out a sick-call request form. Cooper complains that Officer Turner later insisted that Cooper walk to the dining hall while he was in great pain. Further, Cooper claims that Nurse Diaz later gave him ophthalmic (eye) drops for an ear infection, causing the pain to worsen, and then she refused to provide additional treatment because necessary medical equipment was unavailable.

Cooper also alleges that while at MCTC he was placed in a cell that was constantly flooded with feces and urine from the toilet in an adjoining cell. Cooper avers that he informed Sgt. Burkett several times about the problem and Sgt. Burkett always responded saying "You shouldn't have come on lock-up." ECF No. 21, Attachment

Cooper also complains that there is no chaplain at RCI for Islamic and Moorish Science Temple of America inmates. Lastly, Cooper complains that RCI provided his social security number to a telephone company without his consent.[3] He requests damages for pain and suffering and for hindering his religious practice.

**FACTUAL BACKGROUND**

---

services to inmates at certain institutions, including the Maryland Correctional Training Center.
3   Cooper neither provides any additional facts in support of this claim nor identifies a federal law or constitutional provision that was allegedly violated. Counsel for the State Defendants does not address this claim in their dispositive motions. The Court will dismiss this claim without prejudice.

A.      Medical Claim

On September 15, 2009, Cooper was seen by medical providers at MCTC for sharp pain in his left ear. Wanda Diez, R.N. examined his left ear and found the outer ear was warm, the ear was lightly reddened, and the tympanic membrane (eardrum) was bulging. She also observed the sclera of his eye was red. ECF No. 17, Exhibit A. Nurse Diaz gave Plaintiff Motrin for pain relief, and referred him to the physician assistant. On or about the same day, Ava Jobber, M.D. ("Dr. Jobber") prescribed two antibiotics, amoxicillin and Rocephin, as well as Motrin to treat Cooper's earache. ECF No. 12, Exhibit A, ¶ 3.

On October 14, 2009, Cooper submitted a Sick-Call Request for an ear infection. On October 21, 2009, an unsigned note recommended that Plaintiff be called up to the Dispensary in the daytime to assess his ear and to refer him to the physician or physician assistant as necessary. On October 21, 2009, Dr. Joubert prescribed sulfacetamide sodium10% ophthalmic (eye) drops to treat Plaintiff's ear infection.[4] Plaintiff received the drops on October 23, 2009. ECF No. 12, Exhibit A, ¶ 4.

On October 30, 2009, Nurse Diez examined Cooper. During the evaluation Plaintiff stated that his ear still hurt and rated his pain as six on a scale of ten, with ten being the worst possible pain. Nurse Diaz examined Cooper's outer ears and saw no redness or drainage. She was unable to perform a more detailed examination because necessary equipment was in use in another clinic. Nurse Diaz referred Plaintiff to the physician assistant for further evaluation. ECF No.12, Exhibit A, ¶ 5. On November 9, 2009, Cooper filed an Administrative Remedy

---

[4]  Physician's Assistant McDonald explains in his affidavit that although a medication might be labeled for ophthalmic use, sulfacetamide sodium 10% is an antibiotic solution that can be used to treat eye or ear infections. Only medications labeled for ophthalmic use can be used in

Procedure (ARP) request at MCTC complaining of continuing ear pain and about the medications provided to him. ECF No. 17. The ARP, date stamped November 11, 2009, was determined meritorious because of the delay in treatment. Cooper was informed that a medical provider would evaluate him. *See id.*

On November 13, 2009, Kevin McDonald, P.A., saw Cooper for a follow-up evaluation to assess complaints of continuing pain. Cooper stated that he had difficulty hearing in his left ear. McDonald's examination revealed that Cooper's ears were normal with no redness, drainage, or wax. McDonald noted that Cooper's tympanic membrane was bulging in his right ear, but normal in his left ear. McDonald's diagnosis that Plaintiff had serous otitis media (fluid in the middle ear). Accordingly, McDonald prescribed pseudoephedrine, a decongestant, to treat the ear infection. He also prescribed naproxen, a non-steroidal anti-inflammatory medication for the ear pain. ECF Exhibit A, ¶ 6. He instructed Cooper to return if the condition did not improve or worsened.

On December 11, 2009, Cooper returned to the medical department for continuing left ear pain. Physician's Assistant McDonald's examination revealed normal tympanic membranes and mild crepitus (cracking). He diagnosed Cooper with temporomandibular joint (TMJ or Jaw) pain, prescribed Naproxen for one month, and ordered an x-ray of the mandible. ECF No. 19, Exhibit 1, pp. 9-11. On December 24, 2009, Sudhir Kathuria, MD, interpreted the x-ray as normal. ECF 12, Exhibit A p. 4 ¶ 7. On December 29, 2009, Plaintiff was transferred to RCI. Plaintiff's medical records show that he has not submitted further complaints about his ears. ECF No. 12, Exhibit A, ¶ 8.

---

the eyes. ECF No. 12, Exhibit A, n.2.

Officer James Turner, a correctional officer at MCTC who was Cooper's tier officer on September 15, 2009, has filed an affidavit attesting that he wrote a log book entry on September 15, 2009, that he found Mr. Cooper laying on the cell floor holding the left side of his head and when asked what was wrong, Cooper stated that he was dizzy with severe pain on the left side of his head and that every time he stood up he would go back down to the ground. ECF No. 25, Exhibit A. Officer Turner called the dispensary and told Nurse Wanda the inmate's symptoms. Nurse Diaz indicated that she might see inmate Cooper at a later time and if he was comfortable on the floor, for him to remain there.[5] Officer Turner attests that he did not insist that Mr. Cooper walk "to chow" and he was not aware as to whether he went to chow or not. Officer Turner remained in the housing unit as he was the tier officer. Officer Turner next made an entry at 6:15 p.m. when he was notified that Mr. Cooper was being transported to the dispensary from the chow hall. *See id.*

Sgt. Ernest Burkett, an MCTC correctional officer, has filed an affidavit stating that he is not familiar with Mr. Cooper, but believes that he was Officer-in-Charge when Cooper was in the housing unit. Burkett does not recall Mr. Cooper complaining about toilet overflow and Mr. Cooper did not provide specific dates when the problem is alleged to have occurred. Sgt. Burkett declares that if the condition of Mr. Cooper's cell constituted an emergency, he could have had the problem remedied immediately. In a non-emergency situation, he could have advised maintenance to make repairs. Sgt. Burkett denies ever telling an inmate in Mr. Cooper's situation that "you shouldn't have come on lock-up." ECF No. 25, Exhibit B. There is no record that Cooper filed any ARPs concerning toilet overflow. ECF No. 25, Exhibit C.

---

[5] In his reply, Cooper asserts that Nurse Diaz also responded that she did not like inmates

B.  **RELIGIOUS CLAIMS**

Verified records provided by Defendants show that his transfer to RCI on December 29, 2009, Cooper has been provided with religious services in his registered religious preference, the Moorish Small Circle. ECF No. 19, Exhibits 2 and 3. Prison chaplains are responsible for all of the religious faith accommodation groups recognized by the Religious Services Manual of the Department of Public Safety and Correctional Service Division of Correction DCM 140-001. *Id.*, at 1, ¶ 4 and 12-22. The religious tradition of a chaplain does not affect the chaplain's ability to offer spiritual support to adherents of any of the religious faiths accommodated. Any chaplain can assist any religious adherent of any faith. *Id.*, at 1, ¶ 4.

Before he was assigned to disciplinary segregation, Cooper attended Moorish Small Circle worship in 2010 on January 8 and 15, February 12, 19, and 26, and March 5 and 19. ECF No. 19 Exhibit 2, p 1, ¶ 7, and 3-11;. The Moorish Small Circle meets weekly on Fridays between 7:15 p.m. and 8:15 p.m. and study sessions meet twice monthly at 7:30 p.m. to 8:45 p.m. on the second and fourth Mondays of the month.[6] There is no record that Cooper attended religious study sessions at RCI between December 29, 2009 and March 28, 2010. *See id.*

On March 28, 2010, Cooper was assigned to disciplinary segregation. ECF No. 19, Exhibit 3. Inmates on disciplinary segregation are not permitted to attend congregant worship because they are not allowed to go to the chapel. ECF No. 19, Exhibit 2, pp. 2 and 18. Inmates on disciplinary segregation continue to receive access to religious services through the services of

---

playing with her. ECF No. 33, Attachment.
[6] The Division of Correction Manual on religious services provides for weekly congregant worship unless the religion calls for less frequent congregation or institutional resources cannot accommodate weekly congregation. *See* DCM 140-001 (VI) (B) (1). RCI is unable to accommodate both weekly congregation worship and study sessions. ECF No. 19, Exhibit 2, Part

the prison chaplain. *Id*. p. 2.   RCI Chaplain Keith Kitchen attests that at least every two weeks, he visits the segregation unit where he offers inmates religious books and inquires whether anything additional can be provided by the Religious Affairs Department. *Id*., ¶ 8.  Cooper disputes Chaplain Kitchen's assertion and has submitted the sworn statement of Andre Evens-El in support. ECF No. 21.  In his statement, Andre Evans-El attests that he has not been visited by Chaplain Kitchen every two weeks in the disciplinary segregation unit. *See id*.  Notably, Cooper has not filed any ARP requests at RCI complaining of his religious concerns. ECF No. 19, Exhibit 3.

## EXHAUSTION OF ADMINISTRATION REMEDIES

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust administrative remedies before filing suit in federal court.  Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The language of this provision is broadly construed:  Prison conditions encompasse "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, (2002).  Exhaustion is mandatory and unexhausted claims may not be brought in court.   *See Jones v. Bock*, 549 U.S. 199 (2007); *see also Woodford v. Ngo*, 548 U.S. 81 (2006).  Unless Cooper can show that he has satisfied the administrative exhaustion requirement, his claims must be dismissed.

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative

---

VI, B. 1.

grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. In Maryland, filing a request for administrative remedy with the Warden is the first step in the ARP process provided by the Division of Correction. If this request is denied, a prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days to file an appeal to the Executive Director of the Inmate Grievance Office. *See* Md. Code Ann. Corr. Serv. §§ 10-206, 10-210; Md. Regs. Code Title 12 § 07.01.03.

## STANDARD OF REVIEW

### A. SUMMARY JUDGMENT

Fed.R.Civ.P. 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e)). The court should "view the evidence in the light most favorable to .... the nonmovant, and draw all reasonable inferences in [the nonmovant's] favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Medical Center, Inc*., 290 F.3d 639, 645 (4th Cir.2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

    B.      **EIGHTH AMENDMENT**

         1.      **Medical Claims**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *See Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim, a plaintiff must show that a defendant's actions (or omission) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

The medical condition must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Proof of an objectively serious medical condition does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both

of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F.3d 336, 340 n. 2 (4th Cir.1997). Medical negligence or malpractice does not violate the Eighth Amendment. *See Estelle*, 429 U.S. at 106. Deliberate indifference requires conscious disregard of a substantial risk of serious harm, or that treatment was "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). An inmate's disagreement with medical providers about the proper course of treatment for a condition does not support an Eighth Amendment cause of action. *See Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975).

### 2. Conditions of Confinement

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* To establish the imposition unconstitutional conditions of confinement a prisoner must prove that deprivation of a basic human need was objectively sufficiently serious, and that subjectively the officials acted with a sufficiently culpable state of mind. *See Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir.1995). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).

### C. FIRST AMENDMENT

The Free Exercise Clause of the First Amendment is applicable to the states by virtue of

the Fourteenth Amendment. *See Employment Division v. Smith*, 494 U.S. 872, 876-77 (1990). It provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. Amend. I. A prisoner, however, does not enjoy the full range of freedoms as those not incarcerated; rather state action violates a prisoner's religious rights if it burdens a prisoner's constitutional rights and is not reasonably related to a legitimate peneological interest. *See Turner v. Safley,* 482 U.S. 78, 89 (1987); *accord O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987).

Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone*, 482 U.S. at 348. Inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972). That right is not unfettered. Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the constitution. *See Turner v. Safely*, 482 U.S. at 89-91. The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. In addition, this Court must examine: whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive. *See id.*

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act (RLUIPA). The Act provides in part that:

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a

rule of general applicability, unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).

## DISCUSSION

### A. CLAIMS AGAINST WARDEN HORNING

#### 1. Medical Claim

The Complaint does not allege that Warden Horning was aware of Cooper's medical condition while he was at MCTC and failed to provide or ensure that needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As earlier noted, medical care at MCTC is performed by a medical contractor-Defendant CMS-and neither MCTC staff nor RCI Warden Horning perform a role in inmate medical treatment. Non-medical personnel are entitled to rely on the judgment of medical personnel to manage inmate medical treatment. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir.1990).

To the extent Cooper raises this claim based on supervisory liability, there is no respondeat superior liability in § 1983 proceedings. *See Monell v. New York Department of Social Services*, 436 U.S. 658, 691 (1978); *see generally, Los Angeles County, California v. Humphries*, 131 S. Ct. 447 (November 30, 2010). Supervisory personnel like Warden Horning are responsible only for their personal wrongdoing or for policy or custom that violates constitutional principles. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Consequently, Warden Horning is entitled to summary judgment in his favor.

#### 2. Religious Claim

It is uncontroverted that Cooper failed to raise his religious practice grievances through

the ARP process at RCI. His claims are dismissible on this basis. Moreover, Cooper provides no evidence to demonstrate that he has been denied adequate religious support or that he requested and was denied the assistance of a chaplain. He fails to specify dates when he was denied the opportunity to worship. The record shows that prior to his assignment to disciplinary segregation, Cooper was attending Moorish Small Circle Worship which meets once per week. The record does not suggest improper denial of religious practice.

Insofar as Cooper faults Warden Horning, Cooper fails to show any personal involvement by the Warden. Absent any allegation of personal involvement or unconstitutional policy or custom, there is no legal basis to find Warden Horning liable. Accordingly, Horning is entitled to summary judgment in his favor.

### B. CLAIMS AGAINST OFFICER TURNER AND SGT. BURKETT

#### 1. Officer Turner

Officer Turner attests that after discovering Cooper on lying on the cell floor in pain, he relayed Cooper's request for medical treatment to Nurse Diaz and her message back to Cooper. Turner denies insisting that Cooper walk to the dining hall. He attests that he did not leave the tier and did not know whether Cooper went to chow or not. Viewed in the light most favorable to Cooper, these claims are insufficient to demonstrate deliberate indifference to a known serious medical need. Turner is not a medical provider, and acted appropriately by notifying Nurse Diaz. His actions do not amount to violations of constitutional dimension and summary judgment will be entered in his favor.

#### 2. Sgt. Burkett

It is undisputed that Cooper failed to file an ARP at MCTC to resolve the alleged toilet

overflow problem. The claim against St. Burkett is dismissible on this basis. Burkett attests that he was unaware of the problem and does not recall interaction with Cooper. Further, Cooper neither specifies dates when the situation occurred nor claims to have sustained serious or significant physical or emotional injury resulting from circumstances alleged. Accordingly, Burkett's Motion for Summary Judgment will be granted.

### C. CLAIMS AGAINST NURSE DIAZ and CMS

#### 1. Nurse Diaz

Cooper's assertions against Nurse Diaz for deficient medical care fail to state a claim of constitutional magnitude. Nurse Diaz examined Cooper, provided analgesics, and referred him to other medical providers for additional evaluation and treatment. Although his treatment may have been delayed by several days and Nurse Diaz did not immediately respond to his initial query on September 15, 2009 for ear pain concerns, Cooper fails to show that her actions satisfy the deliberate indifference to serious medical needs standard required to prove a claim of constitutional magnitude. Summary judgment will be entered in favor of Diaz.

#### 2. CMS

Respondeat superior does not apply in actions brought under 42 U.S.C. § 1983 where the defendant is a private corporation. *See Powell v. Shopco Laurel Company*., 678 F.2d 504, 506 (4th Cir. 1982)); *see also Austin v. Paramount Parks, Inc*., 195 F.3d 715, 727-28 (4th Cir.1999). CMS is a private corporate contractual provider of medical services to state institutions, administering medical care only through its agents and employees; thus, the liability alleged against CMS is necessarily vicarious in nature. Because principles of respondeat superior do not apply to § 1983 actions, CMS is entitled to judgment in its favor as a matter of law.

## CONCLUSION

For the aforementioned reasons, Defendants' Motions, construed as Motions for Summary Judgment, shall be granted. Plaintiff's Motion for Summary Judgment is denied. Judgment is entered in favor of Defendants. A separate Order follows.

February 8, 2011

/s/
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE